## Kays v. Zarko

*Harry V. Klein,* for petitioner.
*Louis Cohen,* for respondent.

KREHEL, *P.J.,* June 23, 1981—On June 22,

1981, a two-hour non-jury trial posed the problem of the weight to be given to the most recent scientific evidence in paternity cases: the HLA white blood cell test, when coupled with the red blood cell test. Counsel had stipulated to the admission into evidence the Baltimore Rh Typing Library Report without the need to call witnesses for testimony in the drawing of the blood samples from the birth-mother, her child, and the alleged birth-father, nor the laboratory testing of these samples.

Paternity cases have always turned on the preponderance of evidence to attempt to prove fatherhood, and, in the past, courts have relied in part on red blood cell tests as *exclusionary* evidence. With new scientific testing of HLA white blood cells as *inclusionary* evidence, this court takes the additional step of detailing the new development of such inclusionary evidence in resolving the question of paternity submitted here on all of the evidence: the new scientific test, as well as the old-fashioned testimony of the accuser and the accussee. We note the JARA touchstone in 42 Pa.C.S.A. §6136 of the effect of test results.

From testimony heard, review of exhibits, and reference to published material of the staff of the Baltimore Rh Typing Laboratory on or about April 11, 1980, we determined the following

## FINDINGS OF FACT

1. Plaintiff, Brenda L. Kays, is an unmarried adult residing in Mount Carmel, Northumberland County, Pa., and the birth-mother of Jeffrey J. Kays, born April 13, 1980, the subject of these proceedings.

2. Defendant, Peter Zarko, Jr., is an unmarried adult residing in Mount Carmel, Northumberland County, Pa. and the alleged birth-father of Jeffrey.

3. Plaintiff testified that she mothered three children, one had been placed in adoption, another named Tania was the subject of a paternity suit against Richard Kopitski in October, 1980, before our colleague, Judge Samuel C. Ranck, and Jeffrey, the subject here. In the Kopitski case, Judge Ranck dismissed the action. Plaintiff testified that she was required by the State Welfare Department to file this action.

4. Plaintiff further testified that she had sexual intercourse on two consecutive Saturdays in June, 1978, with defendant at his home, by which she established conception. In cross-examination, she stated that she told defendant later that he "was not the father of my child," putting the statement in an undated letter (Defendant's Ex. #1, and Ex. #1-A), such writing having been done "voluntarily," she "meant it" when she "did it," that it "was the truth;" and postmarked December 20, 1979 (Defendant's Ex. #1-A).

5. Plaintiff also testified that she hand-carried the letter to defendant's home, which was contradicted by defendant's testimony, then stated that the letter referred to another child, Tania (for whom Richard Kopitski had been accused in December, 1978), claiming that she wrote two letters (denied by defendant), and admitted *significantly that the Department of Welfare had pressed her into filing this paternity suit for the welfare checks she is receiving from the State.*

6. Plaintiff's testimony included her knowing of the "blood test reports" and the "plausibility" of 99.76 percent that defendant is the birth-parent father of the child, but that the defendant "doesn't admit it," and "doesn't support it."

7. Defendant testified that there was only one letter from plaintiff; that he asked her for it in De-

cember, 1979, during her pregnancy; that he didn't force her to write it, and no child is named, although the letter refers to the yet-to-be-born, yet-to-be-named "Jeffrey"; and that he "continually denied" that he was, or is, the birth-parent father.

8. Defendant's testimony indicated his denial of sexual relations with plaintiff in June, 1979; that his last sexual relationship with plaintiff was in 1978; and that he "was dating others," and "not frolicking around."

9. On cross-examination, defendant testified that although he denied paternity, he still wanted the letter from plaintiff; the he was "not accused of Tania, even by Kopitski"; and that the letter pertained to the unborn, unnamed Jeffrey, for whom he is accused.

10. Counsel stipulated to the admission of the Baltimore Rh Typing Laboratory Report, dated November 21, 1980, on tests performed on November 20, 1980 of Brenda L. Kays, Jeffrey Kays, and Peter Zarko, Jr., with red cell typings, as well as typing of white blood cell antigen system, known as Human Leukocyte Antigens, or HLA (which are present on most tissues and organs in the body). This report, over the signature of R. Ben Dawson, M.D., admitted as plaintiff's Exhibit #1 (Lab #11234 (14380359)), concludes that "on the basis of these tests, Zarko, Peter, Jr. cannot be excluded as the father of Kays, Jeffrey. PATERNITY INDEX=412 to 1 PLAUSIBILITY OF PATERNITY=99.76%."

## DISCUSSION AND CONCLUSIONS

As prefaced in the opening paragraph, the admission of the most recent scientific blood tests of white blood cell antigens (HLA) as *inclusionary*

evidence, poses the problem of the weight to be attached to it by a trial judge, especially in cases like the one at bar, where the bottom line is 99.76 percent "plausibility of paternity."

Two factors aid in the resolution of this problem: That we consider *all of the evidence*, including the conflicting testimony and its credibility, to determine if there is a preponderance to prove paternity; and that we examine the published material of the staff of Baltimore Rh Typing Laboratory on or about April 11, 1980. It is a unique coincidence that this court, through its domestic relations section, sponsored an Eleven County Regional Seminar on April 11, 1980, with staff members from Baltimore Rh Typing Laboratory as speakers and seminar leaders, and the subject of these proceedings, Jeffrey Kays, was born on April 13, 1980, two days after the Sunbury Seminar.

This court had issued an order on November 1, 1979, to CV-79-3212 outlining this county's procedures on civil actions questioning, or establishing, paternity, by designating Geisinger Medical Center, Danville, Montour County, Pa., as the place for drawing the blood samples of birth-parent mother, her child, and the accused birth-parent father, as well as designating the Baltimore Rh Typing Laboratory as the facility for testing red blood cells and white blood cell antigens (HLA), and filing reports with our domestic relations section. Plaintiff's Exhibit #1 typifies the reports submitted.

Before examining the published material of the Baltimore Rh Typing Laboratory, we focus attention on the conflicting testimony of the accuser and the accusee. At the outset, we conclude that plaintiff's credibility diminished in direct proportion to the length of her testimony. She had accused Richard Kopitski of fathering Tania, and Judge

Samuel C. Ranck did not believe her. My honorable colleague dismissed the case.

Plaintiff was pressed by the State Welfare Department to file this action against someone from whom support payments could be gleaned, rather than welfare checks paid. Regrettably for the State Agency that plaintiff's testimony is not believable in accusing Peter Zarko, Jr., because the costs of the proceedings will be ordered by this court to be placed on the Department of Welfare for its positive pressing to get a paternity suit filed, with its negative negligence in now twice failing to determine some reasonable facts before burdening the courts with false accusations. It is like sponsoring some blonde to play in a Western movie called "Waggin' Tongue," even if Brenda L. Kays is not a blonde.

Turning our attention, lastly, to the staff material in the Seminar Handbook of April 11, 1980, we note initial reference to the past use of *exclusionary* blood tests by the Courts.

"Primarily, testing employed red blood cell typing which, when utilizing six (6) informative red blood cell systems, can exclude 65% of the falsely accused. It is, therefore, apparent that the results gave only a slightly better than a 50/50 chance of excluding a falsely accused man." (Page 1).

In continuing our examination of the material in the Seminar Handbook of April 11, 1980, reference is made to the title of this source as:

"LIKELIHOOD OF PATERNITY," prefaced by the
Staff of the BALTIMORE Rh TYPING
LABORATORY

Following the intitial aforegoing paragraph, we read:

"With the emergence of HLA testing of white

blood cells, it is now possible to exclude 97% of the falsely accused when the red blood cell and HLA systems are both tested."

We add emphasis to the following "reasoning":

"It has been found in the Baltimore Rh Typing Laboratory, that approximately 25% of the cases presented result in exclusion of the putative father. *It can be reasoned that the expected percentage of actual falsely accused men is 25.77%,* as shown by:

$$\frac{97}{100} = \frac{25}{+}$$

$$+ = 25.77\%"$$

By stepping back to the "now possible" exclusion percentage in the prior paragraph, this Laboratory staff "reasons" that:

"Based on the test's ability to exclude 97 out of 100 random, falsely accused men, calculations indicated that in actuality, the red blood cell and the HLA systems, when performed together, are informative in 99.23% of the cases tested at the Baltimore Rh Typing Laboratory."

Continuing our examination of the staff material, we add emphasis to the selective words employed in the crafted "reasoning," mindful that we are dealing with cases presented in the Baltimore Rh Typing Laboratory, and that "expected percentage," the "evaluations," as well as the "calculations," and the "chance," of comparing an accused, such as Peter Zarko, Sr., to "men in a random population," as the following states:

"In cases where no exclusion is found, it is useful to *evaluate* the likelihood of paternity. Each case is *evaluated* by its inclusionary merits. By determining many genetic markers that the biological father

must have contributed to the child, *one can calculate* the putative father's chance of fathering a given child in comparison to *men in a random population.* Calculations are based on figures from population studies of gene frequencies for all the major racial groups." (Emphasis supplied.)

The final reference to the staff material as it affects the instant case, is the footnote in the Seminar Handbook that the "Paternity Index," and the "Plausibility of Paternity," are "adapted from table by Hummel, Family Law Quarterly, Vol. X, No. 3, Fall, 1976, p. 262," and lead us to the:

Interpretation of the Paternity Index (calculations from population studies) and the Plausibility of Paternity is calculated as follows, if:

| PATERNITY INDEX | PLAUSIBILITY OF PATERNITY | CHANCE OF PATERNITY |
|---|---|---|
| 339 | 99.80 - 99.90 | Practically proved |
| 99 | 99.1 - 99.75 | Extremely likely |
| 19 | 95 - 99 | Very likely" |

On Dr. Dawson's Report (Plaintiff's Exhibit #1), Peter Zarko, Jr.'s "Paternity Index" is shown as "412 to 1," and his "Plausibility of Paternity = 99.76%." Within one-one hundredth (.01) of a percentage, defendant's "Chance of Paternity" according to the aforegoing calculations is "Extremely likely." But this piece of evidence, however "scientifically" calculated, does not stand alone. We do not say it lies, but it does not sit well when a preponderance of testimony is hurled upon it.

The aforegoing discussion, as a comprehensive examination of the Laboratory staff's material, was necessary to point out its limitation especially in paternity suits such as the one at bar. The "chance factor" of four-one-hundredths (.04) of one percent, coupled with the "live testimony of plaintiff and defendant, lead us to join defendant's counsel that

the burden of proving paternity by a preponderance of the evidence has not been met, and that justice "cries out" that we find for defendant.

Accordingly, we enter the following

## ORDER

And now, June 23, 1981, after consideration of all the testimony and evidence, including the complaint of Brenda L. Kays in which she alleges defendant, Peter Zarko, Jr., is the father of her child, Jeffrey S. Kays, born April 13, 1980; and also including the results of blood testing conducted by the Geisinger Medical Center and the Baltimore Rh Typing Laboratory, using both Red Cell and HLA Typings, in which defendant was determined within the range of plausibility as the father of the within named child,

It is ordered, that the complaint of Brenda L. Kays, plaintiff, against Peter Zarko, Jr., defendant, in the matter of paternity is dismissed.

Further, the costs of prosecution shall be paid by the Department of Public Welfare, Commonwealth of Pennsylvania, and the costs of the blood testing shall by paid by the domestic relations section, family civil division, from funds received by that Section under the cooperative agreement.